**UNITED STATES of America**

v.

**Tremayne J. WILLIAMS.**

**No. CRIM. 3:02CR49.**

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 9, 2002.

Stephen W. Miller, United States Attorney's Office, Richmond, VA, for Government.

Carolyn V. Grady, Epperly, Follis & Schork, P.C., Richmond, VA, for defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

The defendant, Tremayne J. Williams, was tried on a two count indictment by the Court sitting without a jury. In Count One, Williams was charged with knowingly, intentionally, and unlawfully possessing marijuana (in violation of 21 U.S.C. § 844). In Count Two, Williams was charged with possession of a firearm, in and affecting interstate commerce, by an unlawful user of controlled substances (in violation of 18 U.S.C. § 922(g)(3)).

To prove its case, the United States presented the testimony of Detective William James Burnett of the Richmond, Virginia Police Department and a stipulation that: (1) a marijuana cigarette, a pistol, and ammunition were seized from Williams' car; and (2) the pistol and ammunition had traveled in interstate commerce. At the conclusion of the evidence, the defendant moved for a judgment of acquittal on Count Two pursuant to Fed. R.Civ.P. 29, citing as the ground therefor the decision of the United States Court of Appeals for the Fourth Circuit in *United States v. Jackson,* 280 F.3d 403 (4th Cir. 2002) and the absence of evidence to prove the requisite elements of Count Two (as defined therein). The parties briefed the motion and oral argument was heard. For the reasons set forth below, the defendant's motion for a judgment of acquittal on Count Two is granted.

## STATEMENT OF FACTS

On October 4, 2001, at approximately 10:00 to 10:30 PM, Detective Burnett, who was then off duty but was clothed in full uniform and driving a police vehicle, noticed a police officer and a gathering of people near a parked car.[1] Detective Burnett thought that the other officer, Sergeant Loney, needed assistance in questioning the driver of the vehicle, in handling the assembled crowd, or both, and he stopped to lend a hand.

Shortly thereafter, Detective Burnett heard loud music coming from an automobile that had come to a stop immediately behind the vehicle that Sergeant Loney was investigating. Detective Burnett and Sergeant Loney approached that second vehicle (*i.e.*, the one from which the loud music was coming), and, as they did so, both noticed a strong aroma of marijuana emanating therefrom. However, there was no smoke coming from the vehicle and neither officer observed any smoke within it. Detective Burnett was on the driver's side of the vehicle and Sergeant Loney was on the passenger side.

The passenger of the vehicle began to make furtive movements toward the middle of the front seat. Sergeant Loney became concerned that there might be a weapon in the vehicle and, thus, he requested the passenger to exit it. At the

---

1. The record does not reveal the destination to which Detective Burnett was driving.

same time, Detective Burnett asked Williams, who was in the driver's seat of the vehicle, to exit. It was Detective Burnett's intention, at the time, to place Williams under investigative detention on account of the strong odor of marijuana coming from the car that he was driving.

Williams got out of the car and, "while he was being placed into investigative detention" (i.e., while he was being handcuffed), he volunteered that there was a handgun in the seat of the vehicle. Detective Burnett then finished handcuffing Williams and located the firearm to which Williams had referred. Thereafter, Detective Burnett conducted a quick protective sweep of the interior of the car to assure that there were no other weapons there.

During that process, Detective Burnett discovered a half-burned, warm marijuana cigarette in the ashtray in the center console. Detective Burnett seized the marijuana cigarette and Mr. Williams volunteered that it was his and that "he had smoked it earlier." Williams also confirmed ownership of the gun and represented that "he had papers for it."

## DISCUSSION

The defendant's motion for a judgment of acquittal rests upon two grounds. First, Williams challenges the sufficiency of the evidence that the United States proffered to demonstrate that he is a "user" of a controlled substance, as that term was defined by the Fourth Circuit in *Jackson.* Second, Williams asserts that the statute is unconstitutionally vague and, therefore, violates his right to due process under the Fifth and Fourteenth Amendments to the Constitution of the United States. Resolution of Williams' motion, on either ground, depends in the first instance on a question of statutory interpretation.

## A. The Approach To Statutory Interpretation

Congress enacted the statute at issue pursuant to the Gun Control Act of 1968 and then codified it at 18 U.S.C. § 922(g)(3) which provides, in pertinent part, that:

> It shall be unlawful for any person—
>
> (3) who is an unlawful user of or addicted to any controlled substance
>
> to . . . possess in or affecting commerce, any firearm or ammunition. . . .

The statute does not define the term "user" and, in *Jackson,* the Fourth Circuit observed that "we do not doubt that the exact reach of the statute is not easy to define." *United States v. Jackson,* 280 F.3d at 406.

Several settled precepts inform the process of statutory interpretation. As our Court of Appeals has explained, "we begin, as we must, by examining the statutory language, bearing in mind that we should give effect to the legislative will as expressed in the language." *United States v. Murphy,* 35 F.3d 143, 145 (4th Cir.1994), *cert. denied,* 513 U.S. 1135, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995) (citing *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988)). That task begins by ascertaining whether the statutory "language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997). And, of course, the judicial inquiry must end if the statutory language is unambiguous and "the statutory scheme is coherent and consistent." *Id.* (citing *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 240–41, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290, (1989)); *see also Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–254, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992); *Robinson v.*

*Shell Oil Co.,* 70 F.3d 325, 329 (4th Cir. 1995) (en banc), *rev'd on other grounds,* 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

 In determining whether the meaning of statutory language is plain or ambiguous, courts look to "the language [of the statute] itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson,* 519 U.S. at 342, 117 S.Ct. at 846 (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 477, 112 S.Ct. 2589, 2595, 120 L.Ed.2d 379 (1992); *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991)). Generally, when examining statutory language, words are given their common usage. *Smith v. United States,* 508 U.S. 223, 238, 113 S.Ct. 2050, 2059, 124 L.Ed.2d 138 (1993); *United States v. Murphy,* 35 F.3d 143, 145 (4th Cir.1994), *cert. denied,* 513 U.S. 1135, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995) (citing *Palestine Info. Office v. Shultz,* 853 F.2d 932, 938 (D.C.Cir.1988)). "Courts are not free to read into the language what is not there, but rather should apply the statute as written." *Id.* (citing *DeSisto College, Inc. v. Town of Howey–in–the–Hills,* 706 F.Supp. 1479, 1495 (M.D.Fla.), *aff'd,* 888 F.2d 766 (11th Cir.1989) (per curiam)).

### B. Interpreting The Term "User" In 18 U.S.C. § 922(g)(3)

 Turning first to the undefined statutory term, the common and customary meaning of the word "user" is "one that uses, specif: a person who uses alcoholic beverages or narcotics." [2] *Webster's Third New International Dictionary,* at 2524 (1986). Additional guidance respecting the meaning of the word "user" may be found by considering the meaning of the root

word "use," which denotes, *inter alia,* "the act or practice of using something," "the fact or state of being used," "continued or repeated exercise or employment," "habitual or customary practice: a custom or usual procedure," and "an individual habit or group custom." *Id.*

The common usage of the word, therefore, appears to encompass both the act and the practice of using something. When the word is used in the latter sense (*i.e.,* a practice), it tends to connote continuity, frequency, repetitiveness, habit, or practice—that is, the word reflects a type, or manner, of using something that transcends a single, or isolated, act of use.

In sum, the common usage of the word leads to the conclusion that a "user" is either someone who engages in the act of using (*i.e.,* even just one time) or someone for whom the act of using is marked by practice, continuity, regularity, custom, or repetition. That being the case, it cannot fairly be said that the statutory term, given its usual and ordinary meaning, is unambiguous. To the contrary, and at least in the context of 18 U.S.C. § 922(g)(3), it obviously admits of two rather divergent meanings.

Accordingly, it is necessary to ascertain the specific context of the statutory language. Here, the specific context of the word "user" is marked by its inclusion in statutory text that prohibits both persons who are "addicted to" a controlled substance, and persons who are "unlawful users" of such substances, from possessing a firearm. The specific context of the statutory language, therefore, does not inform the interpretation of the ambiguous term other than to explain that, within the meaning of the statute, one who is an

---

**2.** A second, but not the preferred, meaning of the word "user" is "a right to use resulting from long-continued use." *Id.* That cannot be the definition that Congress intended in 18 U.S.C. § 922(g)(3) because that statute deals with a type of use that is *unlawful,* which, of course, cannot give rise to any such "right."

"unlawful user" occupies a status that is different than that occupied by one who is "addicted to" a controlled substance.

Having considered the specific statutory language, as well as the particular context in which that language appears in the statute, it is necessary to turn to the broader context of the statute as a whole. An examination of 18 U.S.C § 922 reveals that it sets forth a panoply of unlawful conduct respecting the shipment, manufacture, selling, transport, possession, and use of firearms. In subsection (g), the statute defines a number of types of persons who, because of a particular status that they occupy, are prohibited from possessing firearms. In particular, the prohibited persons are those whose status is that of: (1) a convicted felon; (2) a fugitive from justice; (3) an unlawful user of, or one who is addicted to, any controlled substance; (4) an adjudicated mentally defective person or a person who has been committed to a mental institution; (5) an illegal alien (except under certain circumstances); (6) a persons who has been dishonorably discharged from the armed services; (7) a former citizen of the United States who has denounced his citizenship; (8) a person who is subject to certain court orders that are intended to forestall or prevent violent conduct; and (9) a person who has been convicted of a misdemeanor crime of domestic violence. Clearly, each of those nine different statuses (precluding a person from legally possessing a firearm) bespeak of persons who, on account of some aspect of their personal history, have shown themselves, in the eyes of Congress, to be unfit to possess (or otherwise be involved with) firearms.

As noted above, § 922(g)(3) was enacted as part of the Gun Control Act of 1968, which amended an earlier version of § 922 (which also was passed in 1968). *United States v. Herrera*, 289 F.3d 311, 322 (5th Cir.2002). The first statute passed in 1968 "does not contain any provision regarding drug use [,]" however, the Senate Report articulated that Congress' goal therein was to "keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." S.Rep. No. 1097 (1968) *reprinted* in 1968 U.S.C.C.A.N. 212, 2213. *See also Herrera*, 289 F.3d at 322; *Huddleston v. United States*, 415 U.S. 814, 824, 94 S.Ct. 1262, 1268, 39 L.Ed.2d 782 (1974).

As explained in *Herrera*, the Gun Control Act of 1968 was passed later in the same year and it added § 922(g). The House Report respecting that statute explained that a committee report had suggested prohibiting the possession of a firearm by "anyone who is an unlawful user of or addicted to marijuana, any depressant or stimulant drug ... or a narcotic drug ... or [who] has been adjudicated in any court as a mental defective or has been committed under a court order to any mental institution...." *United States v. Herrera*, 289 F.3d at 322 (*citing* H.R.Rep. No. 1577 (1968) *reprinted in* 1968 U.S.C.C.A.N. 4410, 4421).

According to the Supreme Court of the United States, Congress' intent in enacting §§ 922(g) "was to keep firearms out of the hands of presumptively risky people." *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 113, n. 6, 103 S.Ct. 986, 992, n. 6, 74 L.Ed.2d 845 (1983). In *Dickerson*, the Supreme Court explained that, in enacting § 922(g), Congress sought to legislate broadly "to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." 460 U.S. at 112, 103 S.Ct. at 991 (internal quotations and citations omitted). The Second Circuit has observed that the purpose of the Gun Control Act was to prohibit the ownership of firearms by "mentally unstable" or "irresponsible" persons.

*United States v. Waters,* 23 F.3d 29, 35 (2d Cir.1994).

In *United States v. Ocegueda,* 564 F.2d 1363, 1365 (9th Cir.1977), the Ninth Circuit alluded to the broad scope of the Gun Control Act of 1968 when it described the statute as "a comprehensive gun control legislation intended to keep firearms out of the hands of those not legally to possess them because of age, criminal background or incompetency." In *United States v. Purdy,* 264 F.3d 809, 812 (9th Cir.2001), the same Court of Appeals interpreted its decision in *Ocegueda* to have meant that " § 922 explicitly included unlawful drug users as individuals having a 'criminal background,'" and explained that the defendant in *Ocegueda* fit into that classification because he had a history of prolonged use of heroin.

There should be little question, therefore, that evidence suggesting a prolonged pattern of unlawful drug use on the part of a defendant will support a conviction under § 922(g)(3). The issue here, of course, is whether a person may be convicted thereunder where the evidence establishes drug use that was contemporaneous with gun possession, but does not prove any pattern, practice, or consistency of antecedent drug use. It is here that one fully appreciates how accurate the Fourth Circuit was when it observed, in *Jackson,* that "the exact reach of the statute is not easy to define." *Jackson,* 280 F.3d at 406.

In *Herrera,* the Fifth Circuit solved the definitional problem by resort to the rule of lenity. There, the court observed that, like the Fourth Circuit, *see, e.g., United States v. Photogrammetric Data Services, Inc.,* 259 F.3d 229, 249 (4th Cir.2001), the Fifth Circuit "reserves lenity only for those situations in which 'a reasonable doubt persist about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute.'" *Herrera,*

289 F.3d at 323 (*citing Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 465, 112 L.Ed.2d 449 (1990)). Notwithstanding the highly restrictive jurisprudence respecting the reach of the rule of lenity in those circuits, the court in *Herrera* held that it "believe[d] that this is just such an occasion [in which that rule applies]." *Id.*

Thereupon, the Fifth Circuit adopted the following restrictive interpretation of "unlawful user" in § 922(g)(3):

> Giving the term a narrow construction, we hold that an 'unlawful user' is one who uses narcotics so frequently and in such quantities as to loose the power of self control and thereby pose a danger to the public morals, health, safety, or welfare. In other words, an 'unlawful user' is someone whose use of narcotics falls just short of addition, as that term is defined by the Controlled Substances Act. This reading of the term is consistent with the language of our legislative history as well as holdings of our sister circuits, *see e.g., Purdy,* 264 F.3d at 812; *Jackson,* 280 F.3d at 406.

*Id.,* at 323–24. A footnote to that text points out that, during oral argument in that case, the United States had conceded "that to be prosecuted under § 922(g)(3), the drug use would have to be with regularity and over an extended period of time." *Id.* at 324, n. 12.

In *Purdy,* the Ninth Circuit explained that, in that case, the defendant's drug usage was "sufficiently consistent, 'prolonged,' and close in time to his gun possession to put him on notice that he qualified as an unlawful user of drugs under § 922(g)(3)." *Id.* at 812 (*citing Ocegueda,* 564 F.2d at 1365). Significantly, the Ninth Circuit went on to state that "[w]e note, however, that the definition of an 'unlawful user' of drugs is not without limits," *id.,* and then quoted the following language,

which it had set forth in the *Ocegueda* decision:

> Had Oceguega used a drug that may be used legally by laymen in some circumstances, or had his use of heroin been infrequent and in the distant past, we would be faced with an entirely different vagueness challenge to the term 'unlawful user'. . . .

*Purdy,* 264 F.3d at 812. Having explicitly quoted that text from its decision in *Ocegueda,* the Ninth Circuit then offered the following telling comment:

> We think this language [the above cited text of *Ocegueda*] bears repeating. The facts of this case established beyond doubt that Purdy's drug use, like that of Oceguega, was sufficient to put him on notice that he fell within the statutory definition of 'unlawful drug user.' We emphasize, however, that *to sustain a conviction under § 922(g)(3), the government must prove* —as it did here— that the defendant *took drugs with regularity, over an extended period of time,* and *contemporaneously with his purchase or possession of a firearm.*

*Id.* at 812–13 (emphasis supplied).

Although, in *Jackson,* the Fourth Circuit cited to *Purdy,* it did so only for purposes of comparison (*i.e.,* the citation was in the form of "*cf.* "). Earlier in its own discussion of the applicability of the statute, however, the Fourth Circuit held that:

> [s]ection 922(g)(3) does not forbid possession of a firearm *while unlawfully using* a controlled substance. Rather, the statute prohibits *unlawful users* of controlled substances (and those addicted to such substances) from possessing firearms.

*Jackson,* 280 F.3d at 406 (emphases in original). The Court of Appeals also held that the district court had applied the statute reasonably by "finding that the prosecution *must establish* 'a pattern of use and recency of use.' " *Id.* (emphasis supplied).

*Jackson* involved two different arrests. First, Jackson was arrested at a traffic check point when, after he rolled down the window to answer questions, a police officer smelled a strong odor of marijuana. Jackson acknowledged that he had an assault rifle in the back seat of his car, a fact that was confirmed by a plain view examination of that car. Jackson later admitted, after appropriate warnings, that he had smoked marijuana earlier that evening and that he had smoked marijuana twice a day for "some years." *Id.* at 404.

As for the second arrest in *Jackson,* police had stopped the car in which defendant was riding on account of a traffic violation. An officer saw a weapon on the dashboard and, later, confirmed that it belonged to Jackson. *Id.* at 404–05.

The grand jury returned a two-count indictment, both counts of which charged Jackson with possession of a firearm by an unlawful user of a controlled substance (in violation of § 922(g)(3)). At the bench trial, the district court found Jackson guilty on count one, as to which the evidence had indicated frequency, continuity and a pattern of use by Jackson. The court acquitted Jackson on count two, however, and it explained that the firearm possession on that occasion had "occurred too long after the alleged drug use." *Id.* at 405.

The Fourth Circuit affirmed the defendant's conviction on count one because there had been a strong odor of marijuana as the officer approached the car and Jackson had admitted to smoking marijuana twice a day for many years (including earlier on the evening of his arrest). Notably, however, the Court of Appeals also affirmed the judgment of acquittal as to count two, and, in so doing, it explicitly held that the trial judge had applied the statute reasonably when it acquitted the defendant on that count because there was

no evidence showing a pattern of use and recency of use. *Id.* at 406.

Thereafter, in an unpublished opinion, the Fourth Circuit underscored its views respecting the decision in *Jackson* and the reach of 18 U.S.C. § 922(g)(3). In *United States v. Edwards*, 2002 WL 431946, 38 Fed.Appx. 134 (4th Cir.2002),[3] the defendant argued that there was no evidence that he was a user of a controlled substance at the time that he possessed the firearm in question. There, the Fourth Circuit held that:

> In order to sustain a conviction under § 922(g)(3), the Government *must prove* that the Defendant's *drug use was sufficiently consistent, 'prolonged' and close in time to his gun* possession to put him on notice that he qualified as an unlawful user of drugs under the statute. For that holding, the court cites *Purdy* and *Jackson.*

*Id.* 2002 WL 431946, 38 Fed.Appx. at 138 (emphasis supplied). Finding that evidence that the defendant used illegal drugs on a "daily" basis and that he had used illegal drugs two weeks before his firearm possession was sufficient to support his conviction under the appropriate interpretation of § 922(g)(3), the Court of Appeals affirmed. *Id.* 2002 WL 431946, 38 Fed. Appx. at 138.

Those decisions teach that the law of this circuit requires that, to sustain a conviction under 18 U.S.C. § 922(g)(3), the United States must prove that there was a pattern, and recency, of drug use by the defendant (*i.e., Jackson*, 280 F.3d at 406) or that the drug use was "sufficiently consistent, 'prolonged,' and close in time to [the defendant's] gun possession to put him on notice that he qualified as an unlawful user of drugs under the statute"

(*i.e., Edwards*, 2002 WL 431946, 38 Fed. Appx. 134, 138). A district court is not free to hold otherwise. If, as the United States argues, the language in *Jackson* and *Edwards* is incorrect, or if it is to be limited to the facts of those cases, it is the office of the Court of the Appeals to say that.

▪ In so holding, the Court is fully aware that *Ocegueda, Herrera, Purdy, Jackson* and *Edwards* all involved factpatterns where there was evidence suggesting recency, and a pattern, of illegal drug use, continuous use, or protracted use (and, of course, where the temporal element of contemporaneous drug use and firearm possession was satisfied). Conversely, none of those cases involved the factual scenario presented here—that is, evidence of one-time drug use proximate in time to the possession but absent any additional proof suggesting a pattern of, continuity of, or prolonged drug use. And, given that the word "use" denotes the act *or* practice of using something (as an ordinary meaning of the root word "user"), it is somewhat strange to conclude that the statute does not prohibit the possession of a firearm by a person who is using (or presently under the influence of) a controlled substance. However, the rule of *Jackson* requires that result. That is true notwithstanding the fact that the Fourth Circuit decided *Jackson* on facts that are quite different than those that are presented in this case because the rule therein stated is unambiguous and relies upon other decisions that underscore the requirement of a pattern, continuity, or prolonged drug use. And, it is especially true in perspective of the fact that a number of other courts have avoided the need to con-

---

**3.** Local Rule 36(c) of the United States Court of Appeals for the Fourth Circuit establishes that unpublished opinions are not binding as precedent in the circuit and, in fact, discour-

ages their citation except in unusual circumstances. Nonetheless, unpublished decisions are of utility in assisting the analysis of the issues.

front a vagueness challenge to § 922(g)(3) by adopting the very restrictive definition of "user" that *Jackson, Edwards,* and the cases upon which they rely have adopted.

Accordingly, there being no evidence suggesting a pattern of use, continuous use, or prolonged use of a controlled substance on the part of the defendant, the defendant's motion for a judgment of acquittal under Fed.R.Crim.P. 29 must, under the law of this circuit, be granted as to Count Two.[4]

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

**4.** This disposition renders it unnecessary to consider the challenge that § 922(g)(3), as applied to Williams, is void for vagueness.