*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0319p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

     *v.*

RANDALL H. BURCHARD,

        *Defendant-Appellant.*

No. 07-6312

Appeal from the United States District Court
for the Western District of Kentucky at Paducah.
No. 06-00009—Thomas B. Russell, District Judge.

Argued: December 3, 2008

Decided and Filed: September 2, 2009

Before: GIBBONS and WHITE, Circuit Judges; TARNOW, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Richard L. Walter, BOEHL, STOPHER & GRAVES, Paducah, Kentucky, for Appellant. G. David Sparks, ASSISTANT UNITED STATES ATTORNEY, Paducah, Kentucky, for Appellee. **ON BRIEF:** Richard L. Walter, BOEHL, STOPHER & GRAVES, Paducah, Kentucky, James B. Brien, Jr., NEELY & BRIEN, Mayfield, Kentucky, for Appellant. G. David Sparks, ASSISTANT UNITED STATES ATTORNEY, Paducah, Kentucky, Terry M. Cushing, Monica Wheatley, ASSISTANT UNITED STATES ATTORNEYS, Louisville, Kentucky, for Appellee.

     WHITE, J., delivered the opinion of the court, in which TARNOW, D. J., joined. GIBBONS, J. (p. 21), delivered a separate concurring opinion.

_____

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

_____

**OPINION**

_____

WHITE, Circuit Judge.  Following trial on three counts of knowingly possessing a firearm in and affecting commerce while being an unlawful user or addicted to a controlled substance, in violation of 18 U.S.C. § 922(g)(3) and § 924(a)(2), a jury found Defendant Randall H. Burchard guilty of possessing five of the nine firearms charged in the indictment.  The district court sentenced Burchard to concurrent terms of 27 months' imprisonment and two years' supervised release on each of the three counts, and imposed a $6,000 fine.  Burchard appeals from the sentence and final judgment, challenging the adequacy of the jury instruction defining an "unlawful user of controlled substance" and the district court's denial of his motion for judgment of acquittal, contending that the Government failed to establish that his drug use was consistent or prolonged.  We disagree, and affirm.

**I**

Government witness Kimberly Pace testified at trial that she met Burchard for the first time around October 2004, at a motel in Paducah, and that between that time and mid-October 2005 they used crack cocaine together on three or four different occasions, some of those occasions spanning several days.  Pace testified that she had been with Burchard at a motel for 5 to 6 hours, at her home in LaCenter, and several times at his farm.  Every time they were together they used crack cocaine.

Pace testified that she and Burchard were at his farm together a few days before October 13, 2005 (the date specified in Count 1) and used cocaine that he provided.  On the morning of October 12, 2005, they went to a house in Paducah where they obtained crack cocaine, and picked up a woman named Nicole.  The three then rented a room at the Hickory House Motel and smoked crack.  Nicole left the next morning (October 13), before Pace and Burchard awoke.  Burchard asked Pace to call the police because Nicole had stolen $500 from him.  Pace testified that she called the police and that Burchard

asked her to take the crack pipes they had been using and place them outside the motel room before the police arrived.

Officer David White responded to the cash theft complaint. Officer White testified that Burchard told him that Nicole had left with $500 of his, and that he had her cell phone and knew where she lived. Officer White called for back-up, and followed Burchard and Pace (who were in Burchard's truck) to Nicole's house on South 4th Street in Paducah. Nicole was not there, and the officers contacted Nicole's father, who came to the home and allowed them to search it. Officer White testified that they "developed some additional information that supported the fact that drugs may be involved," that he contacted a narcotics detective, and that narcotics Detective Toliver came to the South 4th Street address. Officer White testified that while he was talking to Burchard as Burchard sat in his truck, he noticed a handgun in a holster strapped over the driver's seat. He asked Burchard if it was his gun, Burchard responded that it was, and Officer White then asked to see it, recorded the serial number, unloaded it, and returned it to Burchard after confirming that it was not stolen. The gun was a Ruger model Blackhawk .30 caliber revolver, serial number 51-12649 (the weapon specified in Count 1). The drug detectives then took over the case. Officer White testified that Burchard did not want to make a formal complaint regarding the theft by Nicole.

Pace testified that on October 13, 2005, she and Burchard returned to the motel for their belongings, and each took a couple of hits of crack on the way to pick up a woman named Patricia on South 19th Street in Paducah. Burchard had made a phone call for crack cocaine and they waited for the drug delivery at the 19th Street address. Pace testified that she witnessed a person named "Q" deliver six eight-balls, packed in baggie corners, to Burchard and that Burchard paid him with a check. Pace called the police from the 19th Street house and reported the drug transaction.

Officer White testified that he and another officer were dispatched on that same day, October 13, 2005, to the 19th Street address based on a complaint that there was a male there who had drugs in his possession. When he arrived, he saw one man entering

the house, and later figured out that it was Burchard because he was wearing the same clothes he wore that morning.

Pace testified that since uniformed police officers arrived before the undercover officers, and knocked on the door, the people at the 19th Street house had time to "flush the dope." However, the police recovered an empty baggie from the restroom, and during the execution of a search warrant seized a crack pipe made from a deep-well socket from the console and floorboard of Burchard's truck. The socket material tested positive for cocaine. Later that day, police executed a search warrant for Burchard's blood and urine at Lourdes Hospital. As discussed below, the samples tested positive for cocaine.

On October 28, 2005 (the date charged in Count II), search warrants were executed at the address at which Burchard's vehicle was registered, which turned out to be Burchard's mother's home. The officers showed Burchard the search warrant, and Burchard showed the officers a shotgun in a back bedroom closet. When Burchard noticed that the Ruger .30 caliber revolver was identified in the search warrant, he told the officers that someone had stolen it from his truck several days earlier, and that he had not reported it stolen.

Burchard admitted that he owned a 600-acre farm on State Route 408 West. Agents obtained a search warrant for that location and, in a single-wide mobile home located on the 600 acres, found items including mail that indicated Burchard resided there. Burchard's possession of the premises was confirmed by Reverend Warren, an 86 year-old retired minister whom Burchard allowed to live in a separate house on the farm. Reverend Warren testified that Burchard stopped in to see him and his wife nearly every day, and that he never saw Burchard under the influence of a narcotic. He testified that Burchard had given him several guns sometime in 2003 and asked him to keep them for him, but that Burchard had not seen them or asked to see them since that time, and likely did not know where Reverend Warren had put them in the house.

Officers seized from Burchard's single-wide mobile home a .22 caliber loaded rifle, and drug-related items, including a pipe. Certain of the drug-related items were

analyzed and found to contain cocaine. Officers also seized a .12 gauge shotgun from an uninhabited trailer on the property. Five firearms were recovered from the house Reverend Warren and his wife lived in. Another firearm was recovered from the garage near the house. The jury did not convict Burchard of possessing these six firearms.

Mayfield Police officers had contact with Burchard on November 13, 2005 (the date charged in Count III), after receiving a call that one or more persons in a vehicle were unwanted at a home. Burchard consented to a search of his person and his vehicle. As Burchard stood by his vehicle, he removed his boot per the officers' request, and a glass pipe containing wire mesh fell out of it and broke. The glass tested negative for cocaine, but the copper mesh tested positive. Officers found a .22 caliber handgun with an obliterated serial number on the floorboard of the driver's side of Burchard's vehicle. Burchard reported buying the gun recently.

On November 14, 2005, police executed another search warrant for Burchard's blood and urine. Ryan Johnson, a forensic science specialist at the Kentucky State Police forensic central laboratory, testified that he examined Burchard's samples drawn on November 14, 2005, as well as samples that had been drawn on October 13, 2005 at Lourdes Hospital, and that all samples tested positive for cocaine. Johnson testified that generally, cocaine remains in the blood for a maximum of twelve hours; thus the samples drawn on November 14, 2005 would not have contained cocaine ingested on or about October 13, 2005. He also testified that the levels of cocaine found in Burchard's blood indicated direct ingestion, as opposed to breathing in someone else's smoke.

Several witnesses testified for the defense, including Burchard's son and daughter, in good part regarding the guns found at the house in which Reverend Warren lived. As mentioned, the jury did not convict Burchard of possessing the 6 firearms found in that house and a garage nearby.

The district court denied Burchard's motion for a judgment of acquittal. The jury found Burchard guilty of Counts I and III, and of possessing 3 of the 9 firearms under Count 2. The district court sentenced Burchard to 27 months' imprisonment on each of the three counts, to be served concurrently, a two-year term of supervised release on

each of the three counts, also to be served concurrently, and a $6,000 fine. This appeal ensued.

## II

Burchard objected to the district court's failure to read his proposed jury instruction, thus the issue is preserved. When jury instructions are claimed to be erroneous, they are reviewed as a whole to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision. *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008). A judgment may be reversed if the instructions, viewed as a whole, were confusing, misleading and prejudicial. *United States v. Robinson*, 547 F.3d 632, 637 (6th Cir. 2008). The adequacy of jury instructions is a question of law this court reviews de novo. *H.C. Smith Invs. v. Outboard Marine Co.*, 377 F.3d at 645, 650 (6th Cir. 2004). A district court's refusal to give a requested jury instruction is reviewed for an abuse of discretion. *United States v. Gunter*, 551 F.3d 472 (6th Cir. 2009).

## III

18 U.S.C. § 922(g)(3) provides:

(g) It shall be unlawful for any person--
* * *
    (3) who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));
* * *
to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.[1]

The term "unlawful user" is not defined in 18 U.S.C. § 921, and the Sixth Circuit has not adopted a jury instruction defining "unlawful user."

---

[1]The presentence report states that the Bureau of Alcohol, Tobacco, Firearms and Explosives determined that Burchard's Ruger Model Blackhawk .30 caliber revolver, which was observed in his truck on October 13, 2005, was not manufactured in Kentucky and therefore had traveled in interstate commerce.

Burchard's proposed instruction stated:

> The term "unlawful user of a controlled substance" means a person who uses narcotics so frequently and in such quantities as to lose the power of self control and thereby pose a danger to the public morals, health, safety, or welfare. In other words, an "unlawful user" is someone whose use of narcotics falls just short of addiction. The defendant must have been actively engaged as an unlawful user of a controlled substance during the period of time he possessed a firearm, but the law does not require that he used the controlled substance at the precise time he possessed the firearm. * * * *

The district court rejected Burchard's proposed instruction and read the following instruction, patterned after the Eighth Circuit's criminal pattern jury instruction defining "unlawful user:"[2]

**Possession of Firearm by Unlawful User of or Addict to a Controlled Substance**

> The term "unlawful user of a controlled substance" means a person who uses a controlled substance in a manner other than as prescribed by a licensed physician. A one time use of a controlled substance is not sufficient to be an unlawful user under the applicable statute. Rather, the Defendant must have been engaged in the regular use of a controlled substance either close in time to or contemporaneous with the period of time he possessed the firearm. The law does not require that the Defendant used the controlled substance at the precise time he possessed the firearm. An inference that Defendant was an unlawful user

---

[2]At the time Burchard was tried in 2007, the Eighth Circuit's Pattern Jury Instruction § 6.18.922(G)(3) provided:

Drug User in Possession of Firearm (18 U.S.C. § 922(g)(3))

The phrase "unlawful user of a controlled substance" means a person who uses a controlled substance in a manner other than as prescribed by a licensed physician. The defendant must have been actively engaged in use of [a] controlled substance[s] during the time [he] [she] possessed the [firearm] [ammunition], but the law does not require that [he] [she] used the controlled substance[s] at the precise time [he] [she] possessed the [firearm] [ammunition]. Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct. [An inference that a person [was] [is] a user of a controlled substance may be drawn from evidence of a pattern of use or possession of a controlled substance that reasonably covers the time the [firearm] [ammunition] was possessed.]

[The term "drug addict" means any individual who habitually uses any controlled substance so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of a controlled substance as to have lost the power of self-control with reference to [his] [her] addiction.]

of a controlled substance may be drawn from evidence of a pattern of use or pattern of possession of a controlled substance that reasonably covers the time a firearm was possessed.

The term "addict" with regard to drug use, means any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction.

## A

The district court did not err in rejecting Burchard's proposed instruction. Burchard's instruction was taken from *United States v. Herrera* (*Herrera I*), 289 F.3d 311, 322-24 (5th Cir. 2002), in which the Fifth Circuit construed the term "unlawful user" narrowly, and concluded that there was insufficient evidence to establish that Herrera was an unlawful user of cocaine:

Giving the term a narrow construction, we hold that an 'unlawful user' is one who uses narcotics so frequently and in such quantities as to lose the power of self control and thereby pose a danger to the public morals, health, safety, or welfare. In other words, an 'unlawful user" is someone whose use of narcotics falls just short of addiction, as that term is defined by the Controlled Substances Act.

[*Herrera I*, 289 F.3d at 323-24, 325.] The Fifth Circuit, sitting en banc, vacated the portion of *Herrera I* pertaining to Herrera's unlawful user conviction under § 922(g)(3), and affirmed that conviction in *United States v. Herrera* (*Herrera II*), 313 F.3d 882, 885 (5th Cir. 2002). Although *Herrera II* does not expressly address the *Herrera I* construction of the term "unlawful user," the Fifth Circuit's disapproval and abandonment of the *Herrera I* definition was made clear in *United States v. Patterson*, 431 F.3d 832, 838-39 (5th Cir. 2005):

Patterson argues that the *Herrera I* definition of "unlawful user" is correct, an assertion which would make conviction more difficult. However, the district court misstated the law in its instruction defining "unlawful user." The *Herrera I* standard employed by the district court was rejected by this court in *Herrera II*. Additionally, it is inconsistent with the definition employed by other circuits. However, the error is subject to harmless error review, and we find the district court's error was harmless.

*Herrera I* was vacated by this court's decision to undertake en banc review. Sitting en banc, the *Herrera II* court reviewed the propriety of the defendant's "unlawful user" conviction under the limited manifest miscarriage of justice standard of review because, in his motion for a judgment of acquittal, Herrera had contested only the addiction, not the unlawful user, prong. As a result, the court did not delineate a precise definition of the term "unlawful user;" rather, the court analyzed whether the record was devoid of any evidence that the defendant qualified as an "unlawful user" at the time he possessed the firearm. In so doing, the *Herrera II* court was guided by the government's assertion of the circumstances under which it would charge someone for the crime:

[T]he Government conceded in its supplemental en banc brief that, for a defendant to be an "unlawful user" for § 922(g)(3) purposes, his "drug use would have to be with regularity and over an extended period of time". The Government reiterated this at en banc oral argument: "We certainly wouldn't charge one time use. It would have to be over a period of time."

* * *

Furthermore, no circuit has construed the statute in the manner proposed by the district court and *Herrera I.* Rather, cases interpreting § 922(g)(3) typically discuss two concepts: contemporaneousness and regularity. The Eighth Circuit has explained that "courts generally agree the law runs the risk of being unconstitutionally vague without a judicially-created temporal nexus between the gun possession and regular drug use." *United States v. Turnbull*, 349 F.3d 558, 561 (8th Cir. 2003) (citing *United States v. Jackson*, 280 F.3d 403, 406 (4th Cir. 2002), *vacated on other grounds*, 543 U.S. 1099, 125 S. Ct. 1047, 160 L. Ed. 2d 993 (2005) (finding *Booker* error), *reinstated* 414 F.3d 942 (8th Cir. 2005); *United States v. Purdy*, 264 F.3d 809, 812 (9th Cir. 2001)). The Third, Fourth, and Ninth Circuits have stated that there must be some regularity of drug use in addition to contemporaneousness to meet the statute's requirements. *United States v. Augustin*, 376 F.3d 135, 139 (3d Cir. 2004) ("[T]o be an unlawful user, one needed to have engaged in regular use over a period of time proximate to or contemporaneousness [sic] with the possession of the firearm."); *Jackson,* 280 F.3d at 406 (upholding district court finding that the prosecution must establish "a pattern of use and recency of use"); *Purdy*, 264 F.3d at 812-13 ("[T]o sustain a conviction under § 922(g)(3), the government must prove . . . that the defendant took drugs with regularity, over an extended period of time, and contemporaneously with his . . . possession of a firearm."). Based on *Herrera II* and the construction of the statute by other circuits, we conclude that the district court erred in its definition of "unlawful user."

> Though the district court erred, this error was harmless. Patterson suffered no injustice because he would have been convicted even had the jury been correctly charged. The jury convicted him of a higher standard, a standard approaching "addict," as opposed to the lower standard of "unlawful user."

*Patterson*, 431 F.3d at 838-39 (some internal citations omitted). Thus, *Herrera I* provides no support for Burchard's position.

Burchard asserts that his proposed definition of "unlawful user" finds support in three additional cases, which he cites without discussion, *Robinson v. California*, 370 U.S. 660 (1962), *United States v. Purdy*, 264 F.3d 809 (9th Cir. 2001), and *United States v. Freitas*, 59 M.J. 755 (N.M. Ct. Crim. App. 2004).

In *Robinson*, the Supreme Court held that a California statute that made the status of narcotic addiction a criminal offense inflicted a cruel and unusual punishment. The trial court had instructed the jury that the statute made it a misdemeanor for a person:

> either to use narcotics, or to be addicted to the use of narcotics. * * *. That portion of the statute referring to the 'use' of narcotics is based upon the 'act' of using. That portion of the statute referring to 'addicted to the use' of narcotics is based upon a condition or status. They are not identical. * * * To be addicted to the use of narcotics is said to be a status or condition and not an act. It is a continuing offense and differs from most other offenses in the fact that [it] is chronic rather than acute; that it continues after it is complete and subjects the offender to arrest at any time before he reforms. The existence of such a chronic condition may be ascertained from a single examination, if the characteristic reactions of that condition be found present.
>
> * * *
>
> All that the People must show is either that the defendant did use a narcotic in Los Angeles County, or that while in the City of Los Angeles he was addicted to the use of narcotics * *.

*Robinson,* 370 U.S. at 662-63. The Supreme Court struck down the statute, noting:

> The instructions of the trial court, implicitly approved on appeal, amounted to 'a ruling on a question of state law that is as binding on us as though the precise words had been written' into the statute. . . . Indeed, in their brief in this Court counsel for the State have emphasized that it is 'the proof of addiction by circumstantial evidence * * by the tell-tale

track of needle marks and scabs over the veins of his arms, that remains the gist of the section.'

This statute, therefore, is not one which punishes a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration. It is not a law which even purports to provide or require medical treatment. Rather, we deal with a statute which makes the 'status' of narcotic addiction a criminal offense, for which the offender may be prosecuted 'at any time before he reforms.' California has said that a person can be continuously guilty of this offense, whether or not he has ever used or possessed any narcotics within the State, and whether or not he has been guilty of any antisocial behavior there.

It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease. A State might determine that the general health and welfare require that the victims of these and other human afflictions be dealt with by compulsory treatment, involving quarantine, confinement, or sequestration. But, in the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

We cannot but consider the statute before us as of the same category. In this Court counsel for the State recognized that narcotic addiction is an illness. Indeed, it is apparently an illness which may be contracted innocently or involuntarily. We hold that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment. . . .

*Robinson*, 370 U.S. at 666-668 (some internal citations omitted). *Robinson* does not provide assistance in defining "unlawful user" under § 922(g)(3), and it is not apparent how *Robinson* would support the instruction Burchard requested. Section 922(g)(3) does not criminalize the status of being an unlawful user or addict, but rather, the act of possessing a firearm while being an unlawful user or addict. Further, the court's instruction required the jury to find actual regular use of a controlled substance rather than permitting a finding of guilt to be based on a determination of Burchard's status without regard to his conduct.

Burchard's reliance on *Purdy*, *supra*, is also misplaced.  In *Purdy*, the Ninth Circuit held that the term "unlawful user" in § 922(g)(3) was not unconstitutionally vague as applied to the defendant under the circumstance that testimony established that the defendant had used drugs for years, and had smoked marijuana and methamphetamine contemporaneously with his possession of a firearm, such that he was on notice that he qualified as an unlawful user.  The *Purdy* court noted:

> Based on the facts established at trial, there is no doubt that Purdy possessed a firearm.  Nor is there any doubt that Purdy smoked methamphetamine and marijuana, which are defined as controlled substances under federal law.  The only question is whether § 922(g)(3) provided Purdy with sufficient notice that the manner and extent to which he smoked marijuana and methamphetamine qualified him as an "unlawful user of . . . a [] controlled substance."  18 U.S.C. § 922(g)(3).

> In [*United States v.*] *Ocegueda*, [564 F.2d 1363, 1364-65 (9th Cir. 1977),] we confronted a constitutional challenge to § 922 similar to the one that Purdy raises here.  Ocegueda was convicted of 'knowingly receiving firearms' while being 'an unlawful user . . . of' heroin. *Id.* at 1364.  On appeal, Ocegueda challenged the conviction claiming that the term 'unlawful user' was unconstitutionally vague as applied to him. *Id.* at 1364-65.  We rejected this claim because (1) Ocegueda had a six-year history of heroin use leading up to his arrest; and (2) "[c]ircumstantial evidence and the admissions of [Ocegueda] clearly show the continued use of heroin during the period of the gun purchases." *Id.* at 1364.  Specifically, the evidence showed that Ocegueda's heroin habit 'date[d] from 1970' and that Ocegueda used heroin 'at least ten times from March to August, 1976,' which was during the period that he purchased the firearms. *Id.*

> In *Ocegueda*, we stated that while the term 'unlawful user' was not defined in the statute or its legislative history, 'a common sense meaning of the phrase clearly includes the conduct of appellant' because Ocegueda's heroin use was consistent, 'prolonged,' and contemporaneous with his firearms purchases. *Id.* at 1365-66.  We also found that our determination was supported by 'the statutory history,' which indicated that § 922 was enacted 'to keep firearms out of the hands of those not legally entitled to possess them because of . . . [their] criminal background.' *Id.* at 1365-66.  Specifically, we noted that § 922 explicitly included unlawful drug users as individuals having a 'criminal background,' and that Ocegueda fit within this class because of his 'prolonged use of heroin,' an 'unlawful' drug. *Id.* at 1366.

Purdy contends that unlike Ocegueda, his drug use was too 'infrequent' and inconsistent to put him on notice that he could be classified an 'unlawful user' of drugs. We disagree. Henderson's testimony at trial established that Purdy, like Ocegueda, had used illegal drugs–cocaine, methamphetamine, and marijuana–on a regular basis for years, and that he had smoked methamphetamine and marijuana contemporaneously with his possession of a firearm. Under *Ocegueda*, this evidence establishes that Purdy's drug use was sufficiently consistent, 'prolonged,' and close in time to his gun possession to put him on notice that he qualified as an unlawful user of drugs under § 922(g)(3). *Ocegueda*, 564 F.2d at 1365.

We note, however, that the definition of an 'unlawful user' of drugs is not without limits. Indeed, in *Ocegueda* we concluded our analysis by stating:

Had Ocegueda used a drug that may be used legally by laymen in some circumstances, or *had his use of heroin been infrequent and in the distant past,* we would be faced with an entirely different vagueness challenge to the term 'unlawful user' . . . .
564 F.2d at 1366 (emphasis added).

We think this language bears repeating. The facts of this case establish beyond doubt that Purdy's drug use, like that of Ocegueda, was sufficient to put him on notice that he fell within the statutory definition of 'unlawful [drug] user.' We emphasize, however, that to sustain a conviction under § 922(g)(3), the government must prove–as it did here–that the defendant took drugs with regularity, over an extended period of time, and contemporaneously with his purchase or possession of a firearm.

*Purdy*, 264 F.3d at 811-13 (certain internal citations and footnotes omitted). *Purdy* does not support Burchard's proposed instruction. As emphasized in *Purdy*, "to sustain a conviction under § 922(g)(3), the government must prove . . . that the defendant took drugs with regularity, over an extended period of time, and contemporaneously with his purchase or possession of a firearm." *Purdy,* 264 F.3d at 812-13. This is a far less demanding standard than Burchard's proposed instruction, which required proof of use "so frequently and in such quantities as to lose the power of self control and thereby pose a danger to the public morals, health, safety, or welfare." The district court's instruction in the instant case made clear that regular use of cocaine contemporaneous with, or near the time of possession of a firearm, was required.

The third case Burchard cites in support of his proposed jury instruction, *Freitas*, is a decision of the United States Navy Marine Corps Court of Criminal Appeals holding that a single use of marijuana during the defendant's ownership of the handgun in question[3] did not make him an "unlawful user," as the term denotes a pattern of use, and that the defendant's guilty plea thus could not stand. *Freitas* quoted the "unlawful user" definition applied in *Herrera I*, 289 F.3d at 322-24, and was issued before the Fifth Circuit's decision in *Patterson*, discussed *supra*, which makes clear that the *Herrera I* instruction is no longer viable in that circuit. Further, the instruction here made clear that one-time use could not support a conviction, and that the term "unlawful user" contemplated regular use either close in time to or contemporaneous with the period of possession of the firearm.

Given that the term "unlawful user" under § 922(g)(3) is undefined statutorily, that the Sixth Circuit has no pertinent instruction, and that the Fifth Circuit has clearly disapproved the instruction used in *Herrera I*, the district court did not abuse its discretion in declining to read Burchard's proposed instruction and opting for one based on the Eighth Circuit's pattern instruction.

**B**

In addition to challenging the district court's refusal to give his requested instruction, Burchard asserts that the instruction the court gave was "overly simplistic and broad" and ignored the requirement that the government show a pattern or history of drug use. We conclude that the instruction given was adequate under the circumstances.

Burchard complains that the district court erred in defining "unlawful user of a controlled substance" as one "who uses a controlled substance in a manner other than as prescribed by a licensed physician." He contends that this definition "would implicate one who took more than the prescribed dose of Lortab because his broken ankle was

---

[3]The factual basis for the plea included a second use of marijuana subsequent to the firearm being seized by the authorities.

aching, or one who did not take a prescribed antibiotic because it was causing extreme nausea." He argues that "quite simply the proffered instruction misled the jury, and did not properly submit the issue of law for the fact finder."

Burchard has taken the allegedly offending language out of context. To be sure, a definition that simply defined an "unlawful user of a control substance" as a person who uses a controlled substance in a manner other than as prescribed by a licensed physician would be problematic in the contexts posed by Burchard. However, because the instant case does not involve the misuse of a controlled substance prescribed by a physician, and because the court's instruction went beyond this initial statement, we reject any argument that this language resulted in reversible error.

We review jury instructions in their entirety. Taken in its entirety, the district court's instruction made clear that the prosecutor was required to prove more than use of a controlled substance in a manner other than as prescribed by a licensed physician. The instruction emphasized that the prosecution was also required to prove 1) that Burchard engaged in the regular use of a controlled substance 2) either close in time to or contemporaneous with the period of time he possessed the firearm. Further, in the context of the proofs at trial, it is highly unlikely that the court's reference to use of a controlled substance in a manner other than as prescribed by a physician misled the jury into focusing only on the legality of the drug, rather than on whether Burchard engaged in regular use.

Lastly, Burchard argues that the district court failed to recognize that the ordinary meaning of the term "user" includes only individuals who have a pattern or history of drug use. We agree, as do all the courts that have addressed the matter as far as we can tell, that the term "user" contemplates a pattern of use, but conclude that the district court's instruction adequately conveyed this through the concept of "regular use." Because the district court's instruction fairly and adequately submitted the "unlawful user" issue to the jury, we find no reversible error in the instruction.

## C

Because there is no applicable Sixth Circuit instruction, and the instruction given in the instant case could be problematic under different circumstances, we offer an instruction for future use that embodies the necessary concepts[4]:

> The term "unlawful user of a controlled substance" contemplates the regular and repeated use of a controlled substance in a manner other than as prescribed by a licensed physician. The one time or infrequent use of a controlled substance is not sufficient to establish the defendant as an "unlawful user." Rather, the defendant must have been engaged in use that was sufficiently consistent and prolonged as to constitute a pattern of regular and repeated use of a controlled substance. The government need not show that defendant used a controlled substance at the precise time he possessed a firearm. It must, however, establish that he was engaged in a pattern of regular and repeated use of a controlled substance during a period that reasonably covers the time a firearm was possessed.

## IV

Burchard asserts that he was entitled to a judgment of acquittal because the Government failed to establish that his drug use was consistent or prolonged, and thus there was inadequate evidence to support his conviction of possession of a firearm by an unlawful user of drugs under § 922(g)(3). He contends that the only witness who testified regarding his illegal use of drugs was Kim Pace, and that she supplied only three or four examples of illegal drug use by him over several months.

"This court reviews de novo a denial of a motion for judgment of acquittal, but affirms the decision if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt." *United States v. Solorio*, 337 F.3d 580, 588 (6th Cir. 2003) (internal

---

[4]We have reviewed the cases discussing the meaning of the term "unlawful user." In addition to *Patterson, Purdy, Freitas,* and *Ocegueda,* all discussed above, we have reviewed *United States v. Jackson*, 280 F.3d 403 (4th Cir. 2002), *United States v. Augustin*, 376 F.3d 135 (3rd Cir. 2004), *United States v. Mack*, 343 F.3d 929 (8th Cir. 2003), *United States v. McIntosh*, 23 F.3d 1454 (8th Cir. 1994), *United States v. Oleson*, 310 F.3d 1085 (8th Cir. 2002), *United States v. Corona*, 849 F.2d 562 (11th Cir. 1988), abrogated on other grounds *Jaffee v. Redmond*, 518 U.S. 1 (1996), *United States v. Edwards*, 38 F. App'x 134 (4th Cir. 2002), and *United States v. Williams*, 216 F. Supp. 2d 568 (E.D. Va. 2002). While the exact wording varies from case to case, all are consistent with and support this instruction.

quotation marks omitted).  This court will not substitute its judgment for that of the jury. *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).

We disagree with Burchard's characterization of the testimony.  Pace testified that she and Burchard smoked crack cocaine on various occasions over a one-year period, and on several of those occasions for days in a row.  For example, Pace testified that she and Burchard smoked crack for several days before October 13, and on October 13.  The jury heard testimony that on October 13, Burchard carried a holstered gun in his truck, which the police examined, logged, and returned to him unloaded.  There was also testimony that on the second date charged in the indictment, October 28, 2005, search warrants executed at Burchard's farm uncovered four other firearms he owned, as well as drug paraphernalia, some of which tested positive for cocaine.  Further, Burchard's blood and urine, samples of which were taken on October 14, and November 13, 2005, yielded positive test results for cocaine.  Reasonable jurors could have concluded from this evidence that Burchard's use of crack cocaine was regular, sustained, and contemporaneous with his possession of the five firearms.

In support of his insufficiency argument, Burchard asserts that the evidence in this case does not rise to the level of drug use in *United States v. McIntosh*, 23 F.3d 1454 (8th Cir. 1994), and *United States v. Oleson*, 310 F.3d 1085 (8th Cir. 2002).  However, in both *McIntosh* and *Oleson* the evidence was found sufficient to support conviction.  Thus, these cases provide no help in establishing a minimum level of proof required.  That there are factual distinctions between *McIntosh*[5] and *Oleson*[6]

---

[5]In *McIntosh*, a confidential informant, Townsend, told the police in December 1991 that he knew the defendant McIntosh was selling marijuana regularly, and that McIntosh had been armed with a .357 magnum on three occasions when Townsend bought marijuana from him.  During a subsequent set-up buy of one ounce of marijuana, the defendant was wearing a revolver in a holster.  On December 30, 1991, a different officer visited McIntosh at his home and saw a shoulder holster and several .357 caliber rounds.  That day, officers arrested McIntosh, and found him wearing fourteen .357 magnum shells and one .22 caliber long rifle shell.  [23 F.3d at 1455-1456.]  On January 17, 1992, a search warrant of McIntosh's apartment yielded a .25 caliber semi-automatic pistol, marijuana, and drug paraphernalia.  McIntosh admitted during an interview that he sold marijuana from his apartment, carried a gun when selling, and owned a .357 magnum that he used for target practice.  On April 22, 1992, McIntosh was again arrested after pointing a .22 caliber pistol at another man.  On arrest, McIntosh handed over a small bag of marijuana, and officers seized a .22 caliber gun, a Western style cap and ball pistol, and a 12-gauge shotgun from McIntosh's car, among other weapons.  A short time later, McIntosh was indicted.  A jury found him guilty of multiple offenses, including § 922(g)(3).

McIntosh argued on appeal that the district court had erred in rejecting his motion for judgment

and the instant case does not establish that the evidence here was insufficient, but only that the cases are different. Neither case holds that more regular and repeated drug use than shown in the instant case must be established to sustain a conviction under

---

of acquittal on the charge under § 922(g)(3), because the statute should be interpreted as requiring that the government prove he was using the controlled substance at the same time he was in possession of the firearm. The Eighth Circuit disagreed, noting:

> McIntosh reads section 922(g)(3) too restrictively. Our interpretation of section 922(g)(3) comports with the Eleventh Circuit's reasoning in *United States v. Corona*, 849 F.2d 562 (11th Cir. 1988), *cert. denied*, 489 U.S. 1084, 109 S.Ct. 1542, 103 L. Ed. 2d 846 (1989) [abrogated on other grounds *Jaffee v. Redmond*, 518 U.S. 1 (1996)]. *Corona* held the government does not need to prove the defendant was actually using or addicted to drugs at the exact moment he purchased the firearms in question in order to be convicted as an "unlawful user." *Id.* at 567. The plain language requires the government only prove McIntosh was an "unlawful user" or addicted to a controlled substance during the time he possessed firearms.
>
> The government presented ample evidence at trial from which the jury reasonably could have concluded McIntosh was an unlawful user or addicted to marijuana or other drugs during the time he possessed firearms. For example, during the search of McIntosh's apartment, the police found marijuana, syringes, scales, and other drug paraphernalia. Townsend testified he smoked marijuana with McIntosh on previous occasions. Hodge testified McIntosh told him he used "crank," which is a street-term for methamphetamine. Officer DeLisle, who spoke with McIntosh immediately after his arrest in April, testified that McIntosh said to him "I am addicted to drugs and alcohol." When the officers arrested McIntosh, he possessed a small package of marijuana. Finally, Agent Diveley testified that McIntosh told him that when he sold $1,000 worth of marijuana he would "treat" himself to a gram of cocaine. Viewing this evidence in the light most favorable to the government, as we must, we conclude the district court did not err in overruling McIntosh's motion for acquittal on charges of possession of firearms by an unlawful user or a person addicted to a controlled substance.

*McIntosh,* 23 F.3d at 1458-59.

[6]In *Oleson*, the defendant was charged following the execution of a search warrant on December 10, 1999, which yielded twelve guns, a scale, several grams of methamphetamine, several grams of amphetamine, and several pounds of marijuana. At trial, Tracy Slycord testified that Oleson was his steady source of drugs beginning in 1997. Dixie Rodgers testified that she helped to arrange for Oleson to sell methamphetamine to Gavronsky, who purchased methamphetamine from Oleson at Oleson's residence six to eight times over several weeks. [310 F.3d at 1088.] The Eighth Circuit rejected Oleson's argument that there was insufficient evidence to support his conviction under § 922(g)(3), noting

> [] In order to sustain a conviction, there must be evidence that Oleson was an unlawful user of or addicted to controlled substances during the same period of time that he possessed firearms. 18 U.S.C. § 922(g)(3); *United States v. McIntosh*, 23 F.3d 1454, 1458 (8th Cir. 1994).
>
> The evidence of firearm possession here is strong; the police found twelve guns on Oleson's property during execution of their search warrant. Although there was no direct evidence that Oleson was using drugs at the exact moment of the search, the government did show that a user quantity of amphetamine was laid out on Oleson's table, that he lived in the house alone, and that he often used drugs with his customers. These factors taken together support the jury's conclusion that Oleson was a drug user during the same period he possessed the guns.

*Oleson*, 310 F.3d at 1090.

§ 922(g)(3).[7] Burchard cites three additional cases, *United States v. Jackson*, 280 F.3d 403, 406 (4th Cir. 2002), *United States v. Edwards*, 38 F. Appx. 134, 138 (4th Cir. 2002), and *United States. v. Williams*, 216 F. Supp. 2d 568, 575 (E.D. Va. 2002),[8] as supporting that the term "unlawful user" must be construed to require proof of a pattern of use and recency of use of a controlled substance. Burchard is correct, but ignores that the district court's instruction in the instant case covered both those concepts–a pattern of use and recency of use, by stating: "A one time use of a controlled substance is not sufficient to be an unlawful user under the applicable statute. Rather, the Defendant must have been engaged in the regular use of a controlled substance either close in time to or contemporaneous with the period of time he possessed the firearm."

In sum, none of these cases support that the district court erred in denying Burchard's motion for judgment of acquittal. Contrary to Burchard's assertion, the Government presented evidence from which a rational jury could conclude that his drug use was consistent and prolonged, thus there was adequate evidence to support his conviction of possession of a firearm by an unlawful user of drugs under § 922(g)(3). The evidence presented at trial, viewed in the light most favorable to the Government,

---

[7] Putting aside McIntosh's admissions regarding his use and addiction, the evidence of his regular use of a controlled substance was minimal, involving drug paraphernalia on the premises and Townsend's testimony that he smoked marijuana with McIntosh "on previous occasions." Paraphernalia was recovered in the instant case as well.

In *Oleson*, there was testimony that Oleson had supplied drugs since 1997. However, there was little testimony regarding Oleson's own personal use of controlled substances. The opinion refers to testimony that "he often used drugs with his customers," 301 F.3d at 1090, but nowhere sets forth what that testimony was.

[8] In *Jackson*, 280 F.3d at 406, the court held that there was sufficient evidence to convict under § 922(g)(3) where an officer smelled marijuana when he approached the defendant's car, and the defendant admitted smoking marijuana twice daily for many years, including earlier that evening. In the unpublished opinion of *Edwards*, 38 Fed. Appx. at 138, the court held there was sufficient evidence to support a conviction under § 922(g)(3) where a co-conspirator testified that the defendant illegally used drugs two weeks before the firearm possession and that the drug use was not an isolated incident.

Finally, in *Williams*, 216 F. Supp. 2d at 575-76, the district court granted the defendant's motion for judgment of acquittal, concluding that there was insufficient evidence to sustain a conviction where the only testimony was that officers detected a strong smell of marijuana coming from Wiliams's vehicle, and found a handgun and a warm, half-burned marijuana cigarette. After reviewing the relevant cases (including *Herrera I*, because *Herrera II* had not yet vacated *Herrera I*), the district court held that one-time drug use, even contemporaneous with possession of a firearm does not establish the requisite "pattern of use, continuous use, or prolonged use of a controlled substance." 216 F. Supp. 2d. at 576.

would allow a rational trier of fact to find Burchard guilty beyond a reasonable doubt. *Solorio*, *supra,* 337 F.3d at 588.

We **AFFIRM.**

---

**CONCURRENCE**

---

JULIA SMITH GIBBONS, Circuit Judge, concurring. I concur in all of the opinion except Part III.C. While I make no criticism of the instruction offered in that section, I would prefer not to reach the question of what instruction should be given in future cases under § 922(g)(3). In my experience, cases under § 922(g)(3) are infrequently prosecuted, and we have little basis for knowing typical fact patterns in such cases. Selecting an instruction that might be generally appropriate is thus difficult. The better course seems to be to refrain from offering a suggested instruction at this time and do so in the future only if subsequent prosecutions demonstrate that it is needed.